Labick *v.* Vicker, Appellant.

112

Argued November 13, 1962. Before RHODES, P. J., ERVIN, WRIGHT, WATKINS, MONTGOMERY, and FLOOD, JJ. (WOODSIDE, J., absent).

*Francis H. Patrono,* with him *John W. Edwards, Jr.,* and *Patrono and Edwards,* for appellant.

*Paul N. Barna,* with him *Barna and Barna,* for appellee.

Opinion by Flood, J., December 18, 1962:

Following a verdict for the plaintiff in this action for personal injuries, allegedly sustained as a result of the breaking of a ladder supplied by the defendant, the court below overruled the defendant's motions for judgment n.o.v. or for a new trial. On this appeal the defendant contends that (1) the plaintiff was guilty of contributory negligence in using the ladder because it was obviously dangerous or defective, (2) the evidence is inadequate to show that the ladder was supplied by the defendant and (3) the court erred in its charge on damages.

Taking the evidence most favorably to the plaintiff, who has the verdict, the jury could have found the following facts: The plaintiff entered into an agreement with the defendant to wash the walls and ceiling of the showroom of his garage in Monongahela. Under the agreement, the plaintiff was to furnish the same services which had been performed for the defendant two years earlier for the same price. Since the plaintiff had no material or equipment of his own, the defendant was to provide all the equipment and material. The plaintiff purchased sponges, paper cleaner and buckets and when he arrived on the job delivered the bills for this material to the defendant. The plaintiff inquired about the equipment and the defendant directed him to ask Bill Posi, who did occasional maintenance and repair jobs for the defendant, where it was located. Posi told him the equipment was stored in another garage showroom owned by the defendant and located on the opposite side of the street. After one of the defendant's salesmen unlocked the door of this storeroom the plaintiff found there two wooden ladders, one four feet and the other six feet in height, and a plank or scaffolding made of two inch by six inch boards nailed together to make a platform. The defendant decided that the four foot ladder was inadequate and directed

the plaintiff to get a big ladder from the showroom which was to be cleaned and put it against the wall and then to put the six foot ladder "out in the center". The plaintiff complied and made a platform by fitting one end of the plank into a step on the long ladder against the wall and placing the other end on top of the six foot ladder.

The plaintiff complained to the defendant that the six foot ladder was "too wobbly", but the defendant told him: "We just reconditioned that ladder not too long ago; we put heavy nails in it, and, besides, there were heavier fellows than you worked on that ladder." The plaintiff said he would try it out, and climbed up and started paper cleaning. He said: "It still shakes", but the defendant said: "Keep going; I want to get this job done . . . Don't you want this job?" The plaintiff said: "Sure", and started to work. Later the plaintiff told the defendant: "You have to get me another ladder; I can't work on that ladder." The defendant said: "That ladder is safe; we had heavier men than you on that ladder." The plaintiff proceeded to work and after he had worked about 3½ hours, the defendant came into the showroom and the plaintiff again said he wanted another ladder, that it shook too much and the defendant replied: "It's all in your head, you just think that . . . That ladder's safe." The plaintiff had started the work on Saturday and the defendant told him to get going, he wanted the work completed while the garage was closed for the weekend.

Approximately one-half hour after his last conversation with the defendant, while the plaintiff was standing on the platform cleaning the twelve foot high ceiling, a stay on the six foot ladder "pulled away from the board", the brace below it "sprung out", the ladder broke under him and the plaintiff fell to the floor. The plaintiff noticed the ladder giving away beneath him, but he did not have an opportunity to get down

before the ladder broke and fell. The defendant saw the plaintiff fall. The plaintiff said to him, "I told you something was going to happen,—something was going to break," to which the defendant said: "I didn't think that ladder was that weak."

1. The evidence was conflicting as to what caused the plaintiff to fall. He testified, as above noted, that the ladder broke and collapsed, while the defendant and his witness testified that the plaintiff caused the ladder to tip over and fall by overreaching while wiping the ceiling. This dispute was submitted to the jury under appropriate instructions and the verdict indicates that the jury adopted the plaintiff's version of the accident.

The defendant argues that the plaintiff may not recover even under his own version because he used the ladder with knowledge that it was unsafe. A fair reading of the testimony warrants the conclusion that the plaintiff knew only that the ladder was "wobbly" and used it without making an inspection or test to determine its strength or capability of holding the weight and thrust which his use would place upon it because of the defendant's repeated assurances that the ladder had been reconditioned and had been used for carrying greater weight than the plaintiff would put upon it.

The defendant relies upon statements in §§388 and 389 of the Restatement of Torts to the effect that the supplier of a chattel ordinarily may be held liable only if the supplier "has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition" (§388), and the person harmed is "ignorant of the dangerous character of the chattel" (§389). The defendant also cites comment f to §388 and comment d to §389, which indicate that the person using the chattel may disable himself from bringing an action by his contributory negligence in volun-

tarily using the chattel with knowledge of its dangerous condition or by his contributory negligence in failing to make a proper inspection which would have disclosed the defects.

However, the defendant's liability here is not based only on §§388 and 389 of the Restatement of Torts, which determine the liability of those who supply chattels to others for any purpose. Under those sections the liability of the supplier arises only if he supplies a chattel which he knows or has reason to know is or is likely to be unsafe, and he has no duty to inspect it or make it safe for use. Since the chattel in this case was to be used for the supplier's business purposes, §392 of the Restatement also is applicable.

Section 392 reads: "One who supplies to another, directly or through a third person, a chattel to be used for the supplier's business purposes is subject to liability to those for whose use the chattel is supplied, or to those whom he should expect to be in the vicinity of its probable use, for bodily harm caused by the use of the chattel in the manner for which and by persons for whose use the chattel is supplied:

"(a) if the supplier has failed to exercise reasonable care to make the chattel safe for the use for which it is supplied, or

"(b) if the supplier's failure to give to those whom he should expect to use the chattel the information required by the rule stated in §388 is due to his failure to exercise reasonable care to discover its dangerous character or condition."

As stated in comment b to the section: ". . . Section 392 states the rule under which a peculiar liability is imposed upon one supplying chattels for another's use because of the fact that the use is one in which the supplier has a business interest. A person so supplying goods is required not only to give warning of dangers which he knows are involved in the use of the

article, or which, from facts within his knowledge, he knows are likely to be so involved, but also to subject the article to such an inspection as the danger of using it in a dangerous condition makes it reasonable to require of him . . ."

Under §392 of the Restatement the defendant was under a duty to exercise reasonable care to make the ladder safe for the plaintiff's use. This duty included an obligation to subject the ladder to such an inspection as the danger of using it in a defective condition reasonably required. Under these circumstances we cannot hold the plaintiff guilty of contributory negligence as a matter of law for relying upon the defendant's assurances that he had performed his duty and that the ladder, despite its appearance, had been tested and was sufficiently strong, instead of making his own tests or inspection to determine its strength. *Sperling v. Morgold Garage Corporation*, 274 App. Div. 755, 79 N.Y.S. 2d 574 (1948).

It is significant that there is nothing in the comments to §392 relating to contributory negligence by reason of the plaintiff's failure to make an inspection in contrast to the duty of inspection placed upon the supplier by the black-letter of §392(b). No statement regarding contributory negligence for failure to inspect or take precautions such as that relied upon by the defendant and found in comment f to §388 and comment d to §389, above referred to, is found in §392 or the comments to that section. Comment b to the companion §393, which discusses contributory negligence when the person injured knows of the defect, gives no suggestion that the user who does not know of the defect has any duty to inspect or take precautions with regard to a chattel furnished to him for the supplier's business purposes.

The charge of the court on contributory negligence included instructions that the plaintiff would be guilty

of contributory negligence "if the stepladder was so obviosuly inadequate that it was not safe" and that the plaintiff "would be bound to disregard the defendant's assurances that it was safe if these assurances were obviously erroneous." Consequently, we find no error in that part of the charge dealing with contributory negligence.

2. The testimony as to who was to supply the equipment for the job and who actually supplied the six foot ladder also was conflicting, and there was adequate basis for the jury's conclusion that it was furnished by the defendant.

The plaintiff testified that the defendant agreed to supply the equipment and told him to ask Bill Posi where the equipment was. Posi, who did occasional maintenance and repair jobs for the defendant, advised the plaintiff that the defendant's ladder was in the defendant's Oldsmobile showroom, and the plaintiff found it there after one of the defendant's salesmen unlocked the showroom for him.

The defendant testified that the plaintiff agreed to furnish his own equipment. He admitted that the long ladder which the plaintiff placed against the wall belonged to him, but he and one of his employees testified that the six foot ladder which collapsed did not belong to him. William Posi testified that the six foot ladder belonged to him but was locked up in the defendant's Oldsmobile showroom on the morning of the accident and that he did not give the plaintiff permission to use the ladder and did not know he was using it until after the accident.

In view of the conflicting testimony as to who supplied the six foot ladder for the job the court properly submitted the dispute to the jury. Since the defendant could have been found liable as a supplier whether he supplied the ladder "directly or through a third person" (Restatement, Torts §392), his actual ownership

of the ladder was wholly irrelevant. For that reason the court properly refused points for charge submitted by the defendant which, as worded, would have relieved the defendant from liability even though he supplied the ladder in question if the jury found that it was not actually owned by him.

3. The defendant complains that the court's charge was erroneous concerning the amount of the loss of wages suffered by the plaintiff, the plaintiff's doctor's testimony, and loss of earnings and pain and suffering in the future.

As to loss of wages, the defendant complains that the court should have charged as to the effect of the receipt of unemployment compensation benefits and should not have mentioned the specific figure of $1360 in view of the meager testimony as to actual loss of wages.

After stating the date the plaintiff was injured, the date he returned to work and his rate of pay, the trial judge said: "If I understood the testimony, there were possibly eighteen weeks or something like $1360.00. I made a hurried calculation; your calculation may be different. Again you must take into consideration, did he have work available? He was out of work at the time and he got this special work. Would he have lost $1360.00 or would he have lost some lesser sum by reason of not being able to work?"

The defendant contends that the maximum loss of earnings the plaintiff could claim, giving him the utmost benefit of his own testimony, would be $700 calculated as follows: $70 per week for the eleven week period from the date of the injury until December 14, 1959, when the plaintiff's unemployment compensation of $34 per week was renewed on the basis of a light duty slip given to him by Dr. Hughes. The court properly excluded from its calculation unemployment compensation benefits received by the plaintiff and proper-

ly omitted mention of the receipt of such benefits in its charge because the receipt of unemployment compensation benefits is not a proper issue in an action for personal injuries. *Lobalzo v. Varoli*, 409 Pa. 15, 185 A. 2d 557 (1962).

The court's mention of the sum of $1360 does not constitute prejudicial error under the circumstances present here. When the court recited the testimony as to the plaintiff's rate of pay before and after the accident, it had before it evidence that, while the plaintiff was not steadily employed when the accident occurred, he was to be paid $50 for two days' work for the defendant and was looking for other work. The court warned the jury that the figure of $1360 was a hurried calculation on its part, that the jury's calculation might differ, that the plaintiff got this special job at a time when he was out of work, and that the jury might find he lost some lesser sum. The defendant did not except specifically to the court's mention of the figure $1360. His exception to the charge on loss of earnings was only "on the basis that there was no testimony introduced as to any loss of wages from the time of the accident until February 1, 1960." Under the circumstances, we see no basis for granting a new trial.

The defendant complains of the following reference in the charge to the doctor's testimony: "He claimed, and I believe the testimony of his doctor was that he will continue to have some difficulty with this part of his body. He described it as a pain or a sort of locking, or he described the nature of the difficulty with the joint, that his foot would turn to the right sometimes without warning. If I understood the doctor's testimony, the bones had healed in good shape but there may be some difficulty with the muscles or the nerve control in this area."

With respect to muscle pain Dr. Hughes had testified: "The muscles contract from injury which will cause a pulling, an area of pain; using heat and sedation there would have a tendency to relax the muscles and allow the bone to stay exactly the way you wanted it. Q. (By the Court) The purposes of that treatment then was so the muscles adjoining the break would not interfere with keeping the bones in position, and let them heal? A. It would relieve pain. Q. (By the Court) It would relieve pressure? A. That's right. A muscle can be painful itself, in the way of a cramp or Charley-horse." With respect to nerve damage Dr. Hughes had testified: "Q. What about the area of his groin? A. In all probability he would have pain there from any nerve damage that was incurred from the actual bruise at the time of the fall." Dr. Hughes also testified that when he examined the plaintiff the evening before the trial he complained of pain in the groin on pressure or exertion and that the leg bothered him. Dr. Hughes testified: "Q. Doctor, what are his latest complaints? A. He complains of some pain in the groin, mostly on continued pressure, heavy lifting or standing for a great length of time—he would get some pain in there. Q. Is there medical justification for pain in the groin? A. Yes, it could follow the injury. Q. Can you tell us, or can medicine tell us, how long this pain will persist? A. That I cannot tell." While Dr. Hughes stated that there had been a complete recovery, he indicated that he meant by this that the fracture in the bone had completely healed but he could have pain any time. The plaintiff's fellow workers testified that he could not work as well after the accident as before.

At the conclusion of his charge the trial judge asked counsel whether they had anything else which they wished to call to the court's attention. Counsel for the plaintiff requested additional instructions concern-

122

ing an employer's duty to provide safe materials, which request, as modified was granted. Counsel for the defendant merely stated: "I wish to take some exceptions following the charge." Without asking the court to give additional instructions or to correct misstatements in the charge, the defendant took exceptions to the charge on the grounds, among others, that it was inadequate in certain respects and that "Dr. Hughes did not testify that the plaintiff would have any trouble walking as a result of this accident." The trial judge did not so charge unless this could be inferred from his statement above-quoted as to difficulty with the "muscles or the nerve control in this area". Assuming that this could be understood by the jury to mean that Dr. Hughes said that the plaintiff would have difficulty in walking, in the context it does not amount to fundamental or reversible error especially since the judge previously had instructed the jury at length that it should not be guided by his recollection of the testimony, or that of the attorneys, but should be guided by its own recollection. Nor do we find reversible error in the court's charge with relation to future pain and suffering and future loss of earnings.

Judgment affirmed.